## Case No. 14,236.

### TUNNO et al. v. The BETSINA.

[5 Am. Law Reg. 406.]

District Court, D. South Carolina. 1857.

SHIPPING — DISSENTING PART OWNER—MAJORITY AND MINORITY RIGHTS—STIPULATION.

1. A dissenting part owner is entitled to a stipulation to secure his interest in case of a loss on a voyage undertaken against his wishes.

2. The court of admiralty will not order an account as a separate and independent mode of relief, but only as incident to other matter of which it has admitted cognizance.

[Cited in Swain v. Knapp, 32 Minn. 432, 21 N. W. 416.]

3. In the management of a vessel the opinion of the majority shall prevail, unless it forbids its employment, in which case it yields to the minority, who desire its employment, because the public interest must be protected in securing employment to the vessel

[Cited in Lewis v. Kinney, Case No. 8,325.]

4. The court of admiralty has an admitted jurisdiction to secure the value of the dissentient minority's interest, in case of disagreement among part owners in the employment of the vessel.

5. The foreign authorities with regard to the employment and sale of a vessel in case of disagreement among joint owners, collected and commented on.

Libel for stipulation, account, and sale.

Petigru & King, for libellants.

Brown & Porter, for respondent.

MAGRATH, District Judge. The libel in this case asks the aid of the court in three modes of relief: First, in a stipulation from the other part owners for the return of the vessel; second, in having an account taken of her earnings; third, in a decree for sale, upon two grounds: 1st, an irreconcilable disagreement among the owners, as to the mode in which the vessel should be employed; 2dly, misrepresentation in inducing the libellant to become the purchaser of the shares now owned by him in this vessel. The application for the stipulation, intended to secure the interest of a dissenting part owner, in case of a loss in a voyage undertaken against his wishes, has now become a familiar subject for the exercise of admiralty jurisdiction. He who is unwilling that a vessel shall proceed on a given voyage, may give notice thereof to his co-owners; and in case of loss he cannot be made liable to contribute (Abbott, 125), or he may apply to this court, and will be entitled to a stipulation, by which, in the event of loss, they shall be bound to him for the value of his share (Id.). So much of the prayer in the libel as relates to the stipulation has therefore been granted. It may not be improper for me to say, that the stipulation, in such matters, is in its nature provisional. It is not treated nor allowed as a continuing, permanent arrangement, by which the rights of an owner are protected and preserved; but simply as a present measure of relief, afforded in a particular case, for a particular voyage. And when the application for it is regularly made, it then is apparent that a fixed discordance has arisen between the owners, which would seem to call for the exercise of some relief to be adopted, either by them or for them, more perfect and enduring. In relation to the account which is prayed for, it is, in this branch of the case, sufficient for me to say, that considered in itself as a separate and independent mode of relief, it cannot be obtained in the admiralty. The Orleans v. Phœbus, 11 Pet. [36 U. S.] 175; Minturn v. Maynard, 17 How. [58 U. S.] 477. An account will be ordered as an incident of other matters concerning which the court has admitted cognizance. Davis v. Child [Case No. 3,628]. In this case, therefore, the question for an account depends on another question involving the sale prayed for. If a sale can be ordered, then, before the court can divide the proceeds, the mutual accounts of the co-owners must properly be entertained and adjusted, in making a just distribution. Andrews v. Wall, 3 How. [44 U. S.] 568.

The question of the power of this court to order a sale, in a case of disagreement among part owners, has been, and is still, in some respects, a matter of equal importance and doubt. In coming to that conclusion which I shall now announce, it is fitting that with it I should state the reasons which have guided and governed me.

In Great Britain, the power of the admiralty to order a sale among part owners, in case of disagreement, has been hitherto stoutly denied. The case of Ousten v. Hebden, 1 Wils. 101, is cited as the direct authority for the opinion that the admiralty cannot compel a sale of a ship, on the application of a part owner who objects to a certain voyage; and Lord Stowell, in The Apollo, 1 Hagg. Adm. 306, speaking of the stipulation, has declared that "beyond this limit, the court has not moved." But it aids us very little to determine satisfactorily, the true nature and extent of the admiralty and maritime jurisdiction in the courts of the United States, to refer to the opinions of the courts in Great Britain. In the first place, it is now generally conceded, that the jurisdiction of this court, intended to be exercised in the United States, is not limited, as it was known in Great Britain anterior to the Revolution, and as declared by the courts of that kingdom. De Lovio v. Boit [Case No. 3,776]; The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443. In the next place, it is not always that we can be certain, that even in the judgments of these courts, will we find a reliable exposition of the powers which have been admitted to belong to this jurisdiction. In Great Britain, the right of the admiralty to order a stipulation is now undoubted; yet in the court of king's bench, Chief Justice Holt held that the practice was unlawful; and by others

the exercise of the jurisdiction was considered an assumption. Abbott, 125. No one familiar with the acrimonious controversy which was carried on in Great Britain, and had for its object the suppression of the admiralty, and who recalls the disadvantages under which the admiralty contended, will hesitate in understanding why a judge so eminent as Lord Stowell should acknowledge the abstemiousness with which the admiralty always proceeded in the exercise of its jurisdiction. Under the influence of this feeling, the admiralty in Great Britain, in its entertainment of all cases relating to the possession of vessels, has discriminated by separating such questions, into possessory, where the mere fact of possession was concerned, and petitory, in which a question of title was involved; in the former class, exercising, and in the latter, refusing the exercise of, its jurisdiction. But in the United States, the distinction between these classes of cases has never been recognized, and courts of admiralty from the earliest period, in this country, have entertained jurisdiction in cases involving not only the question of possession, but that of title also. The Tilton [Case No. 14,054]. It need scarcely be observed that in this they exercised a familiar jurisdiction which would not have been attempted by a judge holding admiralty jurisdiction in Great Britain. In like manner in the United States, although a mortgage of a vessel has been held not to be a marine contract or hypothecation; and on that ground not to be foreclosed in the admiralty (Bogart v. The John Jay, 17 How. [58 U. S.] 399), yet the right of the mortgagee to intervene in the admiralty, if the vessel was within the jurisdiction of the court, has been always maintained. Andrews v. Wall, 3 How. [44 U. S.] 568. But in England, proceeding from the same doubt of the right of the court to interfere in a question where title was even indirectly involved, a mortgagee could not intervene in behalf of his interest, until by the 3 & 4 Vict. c. 65, § 3, special authority is given to the admiralty to entertain jurisdiction in such cases. Abb Shipp. 130. While, then, the enactment of the British parliament may be relied on as showing that until its passage there was in the court of admiralty of that kingdom no authority to adjudicate a question concerning a vessel in which title is involved, at the same time we are able to see that the courts of the United States, by the exercise of the same jurisdiction without any corresponding legislative provision, very plainly indicated their opinion that a question affecting the title was not per se beyond their jurisdiction.

We are then enabled, in opening our examination of the question here to be decided, to start with two principles of admitted admiralty jurisdiction in the United States: 1st, that disagreement among part owners as to the employment of a vessel is a ground for the interference of this court, admittedly so far as may be necessary to secure to the dissentient minority the value of their interest; and 2d, that in rejecting any distinction between the possessory and petitory proceedings, a jurisdiction was affirmed, although a question of title might be involved. It is well, also, to be borne in mind, that in the case of Ousten v. Hebben, the question of a sale was not before the court. The application related solely to a stipulation, and the opinion of Chief Justice Holt, is in fact, little more than obiter dictum. Abb. Shipp. 126, note. Unquestionably, in the administration of admiralty and maritime jurisdiction in Great Britain and the United States, this marked difference exists in the sources from which the law is derived, as administered by each. In Great Britain the jurisdiction of the court is determined, partly by legislation—by conferences among the judges—and the opinions of judges of the king's bench, in cases before it, in which applications were made for a prohibition against the exercise of admiralty jurisdiction in some particular case. And we are constantly reminded that reference is not made to the maritime law of the world, to determine whether a case can be adjudicated by a tribunal created originally for the administration of that jurisprudence, but to another tribunal not superior, but equal, animated with a jealous rivalry equally unreasonable and unyielding. The Seneca [Case No. 12,670]. It is true, that the popular objection derived from the non obstante statute clause in the admiralty commission, was rightfully one which, in a government resting upon popular principles, should be watched, and indeed should be exploded. But the legitimate consequence of the argument from this, used against the admiralty, should have been extended to, and embraced the king himself. Under the republican government of England, a juster sense of the mode in which the admiralty jurisdiction should be administered, seems to have been adopted: and the rule was then laid down, that matters submitted to it, should be determined "according to the laws and customs of the sea;" but this rule expired with the republican government, and was not re-enacted after the Restoration. Hall. Adm. 26; Ben. Adm. 54.

Considered then in this light, the great argument against the exercise of this or any other power, derived from the "abstemiousness" of the admiralty in Great Britain, to borrow the language of Lord Stowell, loses much of the force it would otherwise possess. We are not at liberty to consider the conduct of the admiralty courts in Great Britain, as the evidence of such a jurisdiction being inconsistent with the limits which should be here assigned to it, and are forced, in this, as in many other questions, to seek other sources of information, in enabling us to decide whether the power is properly to be exercised or not. I shall, therefore, proceed to

examine and ascertain, so far as it can be done with the sources of information within my reach, the maritime law in relation to the employment and sale of a vessel. In the marine ordinance of Louis 14th, it is thus laid down (section 5): "En tout ce qui concerne l'interest commun des proprietaires, l'avis du plus grand nombre sera suivy; et sera, repute le plus grand nombre, celuy des interessey qui auront sa plus grande part au vaisseau." (Section 6): "Aucun ne pourra contraindre son associate de proceder a la licitation, d'un navire commun, si ce, n'est que les avis soient egallement partagez sur l'enterprize de quelque voyage." Pard. Droit, Comm. 4, 356: Coll. de Lois Mar. In the Consulat de la Mer (2 Pard. 62–65, and cc. 10, 11) there is more detail preserved in the statement of the rule, and the reason for it. It is there laid down that no one shall sell his share or interest in a vessel until she has completed her first voyage, and this is said to arise from a consideration of what was due to the captain. He was obliged to have a certain interest in the vessel, had all the trouble and care of her construction, and would be unprotected if his rights were left to his co-owners, who were influenced "par legerete de conduite, ou parce qu-ils sont riches." But when that voyage was ended, a larger part of the owners could have the vessel sold, nor could the master oppose it, unless there had been some special agreement entered into, on the subject. And this sale so proceeding according to the wish of the majority, is stated upon the principle, "Qu'en quelque chose, que ce soit, ou une discordance d'avis se manifeste, la volonte de la majorite l'emporte." But these provisions seemed intended for the case of all, or a majority, (tous ou bien la majeure partie,) of the part owners; it appears, however, that the captain had his correlative rights. "Le patron a autant de droits pour forcer a la licitation les actionnaires que ceux-ci en ont envers lui." These provisions generally were adopted in Code de Com. § 220, liv. 2, tit. 3: "En tout ce qui concerne l'interet commun des proprietaires d'un navire, l'avis de la majorite est suivi. La majorite se determine par une portion d'interet dans le navire, excedant la moietie de sa valeur. Le licitation du navire ne peut etre accordée que sur la demande des proprietaires formant ensemble la moitie de l'interet total dans le navire, s'il n'y a par ecrit, convention contraire." In the law of the Hanse Towns (Droit Maritime de la Ligue Anseatiqué, 2 Pard. 527), there is no provision concerning a sale in case of disagreement. The proceeding is declared to be such as conforms "a l'ancien usage, qui etablit que ceux qui auront la moindre part, et le moins de voix, suivront l'avis de la majorite." Id. 57. It is, however, also provided in this code, that "if the master to displease his owners, (par animosite,) sells his part of the ship for more than it is worth, they shall have the right to take it

at such valuation as arbitrators shall put upon it." Id. 54. In the note of Roccus, translated by Mr. Ingersoll, it is said (note 47), in "maritime controversies, the general maritime law is to be the rule of decision, provided it be not contrary to the law of the land." There is no express provision concerning a sale, but in the 6th note it is provided that if a ship has two owners, and both choose a captain, the judge shall decide between them; and "if the judge cannot effect a concurrence, the ship must remain without a commander, until a concurrent appointment can be made;" and in note 49, "if a controversy arise among several owners of a vessel, respecting different offers made for chartering a ship, he is preferred who offers the highest freight, and if the freights offered are equal, the judge will make the election to determine the dispute." In 1793, in the United States court in this state, an application was made to Judge Bee for a sale of the sloop Hope [Case No. 12,927], to make a division; and the application would appear to have been rested upon the apprehension of some fraudulent conduct, intended by the other part owner. The report of the case is brief, and far from satisfactory, nor can I find any authority in the admiralty for ordering a sale under the circumstances of the case, as they can be gathered from the report. There was enough, in all probability, to warrant a court of equity to interfere, and that court often exercises its authority auxiliary to a court of admiralty, as in the matter of a stipulation where the value of the vessel is uncertain. After much reflection, I cannot recognize this case, as determining a question of disputed jurisdiction, with all the respect I have for the learned judge by whom it was decided. In 1800, in Pennsylvania, the case of Willings v. Blight [Case No. 17,765], was decided by Judge Peters. In this case, the learned judge expresses an opinion as to the power of the court to order a sale; but the application in the case was not for a sale, but to be allowed to give a stipulation that the ship might proceed on her voyage. And the opinion so given as to the sale, seems rested on the Sea Laws, 442, and Beawes' Lex Mercatoria, 49. These authorities, the latter particularly, I shall refer to hereafter. The reference to the marine ordinances of France, does not appear to have been made, except incidentally, and instead of making a decree for a sale, the learned judge declares that, "a privation of freight, the fruit and crop of shipping, seems therefore to be the appropriate mulct on indolent, perverse, or negligent part owners."

In 1828, in Pennsylvania, the question again arose in the case of Davis v. The Seneca [Case No. 3,650], before Judge Hopkinson. The libellants were owners of one-half the brig. The other half of the brig was owned by the captain, who kept possession of her. The case, in fact, was one of disagreement between owners of equal shares as to the best

employment of the vessel. Judge Hopkinson refused the sale, and an appeal was taken to Judge Washington, who reversed the circuit decree, and ordered the sale. The Seneca [Case No. 12,670]. Judge Washington rested his judgment upon two leading principles: 1st. That in determining admiralty jurisdiction we must not be confined to the restrictions which in Great Britain have been adopted, but should refer to the general maritime law. 2d. That in making such a reference, the provision in the marine ordinances of France which provide for a sale, where a half or a larger interest desire it, was to be regarded as laying down a wise and salutary rule of the general maritime law, which he would enforce as the maritime law of the United States. No further proceedings by way of appeal were taken in this case. The opinion of Judge Washington, by an able commentator, is said to have "the support of the most eminent authority." and to express "the rule of American law." Flanders on Shipping, 372.

In the case of The Orleans v. Phœbus, 11 Pet. [36 U. S.] 175, Judge Story declared that "the jurisdiction of courts of admiralty in cases of part owners having unequal interests or shares, is not, and never has been applied to a direct sale, upon any dispute between them as to the trade and navigation of a ship engaged in maritime voyages." Nor do I understand him—although he is referred to as having done so—(Collyer, 996, in note) as extending the jurisdiction at any time farther than the case of an equal division among the owners, in relation to the employment of the vessel. Story, Partn. § 439. Although the title by which a vessel is held is not subject to the general law of a partnership, by which each partner has the power of disposition over the property of the concern; but instead of this, each stands to his associates in the relation of a tenant in common, with a perfect right to dispose of his own share, without affecting the shares of his co-owners; yet that general principle in all voluntary associations, by which the opinion of the majority controls in whatever relates to the subject matter of the common property, must still be recognized as applicable to the ownership in vessels. In the references which I have made to the established sources of the maritime law in Europe, it will be seen, that this, to me, seemingly necessary authority in the majority, is everywhere recognized as a part of the fundamental law. How far the practice, adopted at a very early day in Great Britain, of qualifying the right of the majority by a stipulation for the benefit of the minority, is adopted among continental courts in the exercise of admiralty jurisdiction, it is not easy to ascertain; but in Great Britain and in the United States, it is now recognized as an appropriate exercise of admiralty jurisdiction, and a proper condition to be imposed upon the general authority vested in the majority of the part owners for their employment

of a vessel, against the wishes of the minority.

The right of the majority to employ a vessel, against the wish of a minority desiring some other voyage, subject to the condition of giving a stipulation, is then clear, and the right of the majority to employ a vessel against the wish of a minority not desiring any employment of the vessel, is equally clear, subject to the same condition. The source of the right is in the fact of there being a majority in interest who favor the employment; but superadded to it, is another reason, derived from the considerations of public policy, and which is said to require the employment of vessels. Whether in the case where a majority desiring the employment of a vessel, a minority not desiring any employment, and that majority unable to make a sufficient stipulation; considerations of public policy would override the condition for the stipulation, or the latter will be preserved to the suppression of the former, and the destruction of the vessel, is a question yet to be decided; and upon its decision depends the decision of another question, which is, whether the order for a stipulation is a matter of right, or subject in any degree to the discretion of the court. If the order for the stipulation be a matter of right, then it may be, that the inability of the majority to give it, might present the case of the vessel rotting in her dock. "The right," says Judge Story (Partnership, § 439,) "to order a sale of property subject to its jurisdiction, is clearly a matter within the competency of a court of admiralty, and indeed is familiar in practice, in order to prevent irreparable mischief, or impending losses." But conceding this to be so, as of course it must be, upon the familiar principle that a court has the power to preserve the subject of its jurisdiction pendente lite, yet it does not aid us in resolving the doubt, for the propositions stand to each other in this position; if the power of sale is in the court, (in case of irreparable mischief or impending loss,) it is because the case and the thing to which the case relates, is within its jurisdiction, and if the case is subject to its jurisdiction the power of sale (in the cases stated in the text) is necessarily in the court. The solution of either will determine the other, but neither or both decide the real question, whether a power in the admiralty to decree the sale of a vessel, as a substantive power, is or not, within its jurisdiction.

I have had occasion to refer to the article in the marine ordinances of Louis 14th, which provides that in everything which concerns the common interest of the owners, the opinion of the greater number will prevail; and farther, that that shall be reputed the greater number which represents the larger interest. By this, the major part may employ the vessel in a certain voyage, by the mere fact of being the major part, though the minority object. 1 Valin. Comm. 582.

And such is the law in England, with the qualification of a stipulation for the minority. Beawes, Lex. Mer. 45; Molloy, 61, c. 1, 220. But if the major part do not desire to employ the vessel, but the minority do so desire, what then shall be the rule? According to the marine ordinances of Louis 14th, in this question, as in others, the rule of the majority prevailed; and if they so desired it the vessel would remain unemployed. 1 Valin, Comm. 582. But in England the rule would seem to be different, for it is laid down, that if but one is left for the voyage, yet the same right to employ the vessel, subject of course to the stipulation, shall be with him. Molloy, 220. To this is added, in the text, the seeming qualification, "especially if there be equality in the partnership." Page 120. On the other hand, Beawes lays it down, that if the greatest part refuse to fit out the vessel, they shall not be compelled on account of their majority, but the ship shall be valued and sold. Beawes. Lex. Mer. 49. Cleirac, as cited by Valin, 582, declares, that if two citizens own a ship, the one who wishes to navigate or employ (l'un d'iceux veut qu'il navige). and the other opposes, the right of him who wishes to navigate shall prevail. To the same effect, is Kuricke, sur le Droit Hanseatique, 759, cited in Valin, ut sup. "Certe eum prevalere debere qui navim navigare, quam otiosam domi manere mavult." And to these follow Straccha de Navibus, cited also in Valin, and who rests upon the principle that in association their wish should be consulted, who desire to employ a vessel in that use for which she was constructed. And the same conclusion, as to the right of the minority in such a case, was adopted by the supreme court of the United States. The Orleans v. Phœbus, 11 Pet. [36 U. S.] 175. I do not find the rule as laid down in Beawes, in the case of the refusal of a majority to employ the vessel, so expressed in any other authority. By the French law, the opinion of the majority would prevail, and the minority would have to submit. But according to Molloy, if the major part refuse to employ the ship, the minority shall have the privilege of employing her on the same terms which would have been imposed on the majority, that is, giving a stipulation for the shares of the dissenting part owners, in case of loss, and in this, concur Cleirac, Kuricke, Straccha, and Judge Story.

If we come to a closer examination and summary of the general maritime law upon this question, we shall arrive at these results: A vessel, although the subject of private ownership, is regarded as a matter also of public interest. The public interest is protected in securing the employment of the vessel. In the management of a vessel, the opinion of the majority in value shall prevail, unless it forbids its employment, in which case it yields to the minority desiring its employment. The sale of a vessel is not encouraged, because the interference of the court in aiding a discontented part owner to force a sale, would in many cases serve only to gratify caprice or passion, tend to the injury of other part owners, and invite frequent and injurious interruptions of commercial operations. In case of disagreement between part owners who have an equal interest concerning the employment of the vessel, a sale will be ordered, but such disagreement must not be upon the question of employment or not, for in such case, they who desire to employ, shall prevail, but it must be a disagreement as to the manner in which the vessel shall be employed. It seems to me that in these cases of disagreement among part owners, to which branch of the general question I confine myself, the admiralty will decree a sale; if beyond these, a sale will be ordered, it must depend upon some special considerations connected with a certain case out of which no general rule can be framed. In the first of these cases, a sale will be ordered, because it is impracticable to decide the differences between the owners by the application of any other principle of the maritime law. In the second case, because by the application of the general rule of the maritime law, injury may ensue. In the third case, because it carries into execution a fundamental rule of the maritime law. The first case is illustrated by a disagreement between owners equal in interest, and both desiring to employ the vessel; here it will be seen that the rule respecting the wish of the majority cannot prevail for they are equally divided, nor can you decide this difference by the rule which gives the preference to such as wish to employ the vessel for both desire to do so. It is obvious, then, that as no ground exists for the preference of one over the other, a sale is necessary. The second case is illustrated by what has been already hypothetically stated, where the minority do not wish to employ the vessel, but the majority who wish to employ the vessel, cannot give a sufficient stipulation. If the court cannot exercise a discretion in dispensing with the stipulation—and it would seem as if it were a matter of right which, demanded by the minority, cannot be refused—then a sale would also be necessary to prevent the destruction of the property. The third case, is where a majority in value showing it to be for the general good, ask for a sale; and in granting it the principle is recognized that the opinion of the majority in value shall prevail, which by the Consulat de la Mer is specially applied to a sale. Nor should it be forgotten, that when these principles of maritime law were laid down, a greater necessity existed for the exercise by the court of the power to sell than can now be presented. Then a restraint was imposed upon the exercise of the owner's right to sell, in some cases until a voyage was performed, in others until the expiration of a certain period of time. Dur-

ing the period when the right of the owner was thus controlled, a necessity would seem to exist for a power in the court to order a sale, but I find it nowhere affirmed But now the owner may at any time, to any person, and for any price, dispose of the vessel, or his share, and consequently no corresponding necessity exists from considerations of what is due to private rights. It is true, that in former days vessels were rather regarded as the means by which trade was encouraged and commerce sustained, than as in themselves objects of trade as any other kind of property. And this serves to explain the stringency of the rules by which they were managed. But the unrestricted power of disposition which now is exercised by every owner, provides a remedy for perhaps most cases of irreconcilable disagreement. Doubtless there are cases in which the exercise of this power would be attended with disadvantage, but such a consequence may result in any case where one having joined an association, sells his interest and retires. If the disadvantage is produced or enhanced by his associates, or in any other way invites the interference of the court, it will be afforded. If within the jurisdiction of the admiralty, it will give the proper relief. If not within the jurisdiction of the admiralty, a court of equity will be found adequate to the occasion, proper for the exercise of its authority. I consider that the power to sell, as exercised by Judge Washington, in the case of The Seneca [supra], was carried as far as the best authorities in the maritime law will warrant. Nor is it easy to comprehend for what useful purpose the power could be exercised, in any other cases than such as I have referred to, in which a disagreement between part owners cannot be determined by the operation of principles applicable to associated ownership, or such as are specially provided for an ownership in vessels. Of what use would be the principle which affirms the control resulting to a majority from the fact of its being so, if in any case in which it was to be applied, a court would be asked to decree a sale? It would soon be that the only mode for preventing a dissolution, would be for the majority to render unquestioning accord to the wishes of the minority; no matter how small that minority, or unreasonable its exactions. In this case, the libellant is not the owner of a half of the vessel. He represents a minority in value. And the examination now made satisfies me that he is not entitled to a decree for a sale on the ground of disagreement with the other part owners as to the best mode of employing the vessel owned by them in common.

The second ground upon which the libellant asks a sale, is that he became the purchaser of the share now owned by him in the vessel under certain representations made to him as to the employment of the

vessel; that these have not been fulfilled, and the neglect has been productive of injury to him. This is no ground for a sale. If the representations were all that the libellant considers them, and if they were connected with it and affected the other part owners as if made by them, it would be a case for relief but not for a sale. Part owners may agree as to the mode in which the vessel shall be managed, and the substance of the representations charged by the libellant as made to him is not unusual in such agreements It is simply that the libellant should have the agency of the vessel for the purpose of employing her in the Florida trade. Such an agreement properly made out by proof and affecting the other part owners, would be enforced in this court, not upon the ground of the specific performance of an agreement, which is an appropriate head of equity and not of admiralty jurisdiction, but as a maritime contract. Whatever may be the representations made to the libellant by the captain, they have not been proved to affect the other owners. There is no evidence that such representations from the captain to the libellant were ever known to them. It was not an agreement which the captain, in that capacity, had authority to make, so as to bind the owners, nor as co-owner had he authority to bind his associates by any such agreement. He may have incurred a personal liability to the libellant, but he has not affected the other owners with any liability. The libel can only be retained for the stipulation which it asks, and which has been granted. The rest of the prayer, which asks for an account and sale, is refused.